[Crim. No. 16858. First Dist., Div. One. Jan. 25, 1979.]

THE PEOPLE, Plaintiff and Appellant, v.
CARL LEE DAVIS et al., Defendants and Respondents.

## COUNSEL

Evelle J. Younger and George Deukmejian, Attorneys General, Jack R. Winkler and Robert H. Philibosian, Chief Assistant Attorneys General, Edward P. O'Brien, Assistant Attorney General, Sanford Svetcov, Derald E. Granberg, Michael D. Whelan, Eugene W. Kaster and Laurence M. May, Deputy Attorneys General, for Plaintiff and Appellant.

Robert D. Byrne, Jr., under appointment by the Court of Appeal, Sheldon Portman, Public Defender, Frank D. Berry, Jr., Robert K. Regan and Katherine J. Houston, Deputy Public Defenders, for Defendants and Respondents.

## OPINION

**NEWSOM, J.**—The present appeal is by the People from a judgment of dismissal and order suppressing evidence rendered under the following circumstances.[1]

---

[1]Although the appeal purports to be from the order granting the defendants' motion to suppress, an unappealable order, we treat the notice of appeal as a premature notice of

At 4:30 a.m. on January 13, 1977, Palo Alto Police Officer Deisinger observed two men standing by—exiting or entering—an automobile in the parking lot at the Travel Lodge Motel on El Camino Real in Palo Alto.

Except for the insignificant fact that their vehicle was blocking several unoccupied parked cars, and the lateness of the hour, there was nothing objectively odd or unusual, let alone criminal, in the circumstances. Nevertheless, Deisinger's suspicions were aroused. He called on his radio for a backup, turned his car around to follow defendants' vehicle, stopped it and requested both occupants—driver and passenger—to produce I.D.'s. The driver, Davis, did; but his passenger, Snowden, possessed none. Meanwhile, pursuant to the radio call, another officer, Johnson, had gone to the parking lot and there discovered an abandoned suitcase—as Deisinger knew prior to the arrival at the detention scene of a third officer, Cost. But while Johnson told Officer Cost he had stopped the car because of suspicious activity, he did not impart to him the particular fact of the suitcase having been discovered before Cost shone a flashlight into the suspects' car and observed, in plain view, items known to him in his police experience to be typical auto burglary tools.

Deisinger and Cost thereupon ordered the occupants out of their car, searched its trunk and found stolen property and a bent screwdriver—evidence pragmatically but not necessarily legally justifying Deisinger's original suspicion.

The sole issue presented on this appeal is whether the trial court's conclusion that *the detention*—not the subsequent search—was unreasonable, and hence unconstitutional, was supported by substantial evidence.

## I

█ It is settled in California law that a police officer is justified in stopping and briefly detaining a person for questioning or other limited investigation. (*People* v. *Mickelson* (1963) 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658].) The reasonableness of any particular invasion of a citizen's personal security, however, has been and must be measured by objective standards. Some activity relating to crime must have occurred or be about to occur, and the person the officer intends to stop must

---

appeal from the contemporaneous dismissal. (See Pen. Code, § 1238, subds. (a)(7) and (c); cf. § 1538.5, subds. (j) and (o).)

reasonably[2] appear to be involved in that activity. (*In re Tony C.* (1978) 21 Cal.3d 888 [148 Cal.Rptr. 366, 582 P.2d 957].)

■ Measured by this standard, the conduct in question seems entirely innocuous. As earlier observed, only the position of the car, the lateness of the hour and, it may be, the proximity of defendants to a motel—still regarded in some quarters as a center of opprobrious activity—could remotely be seen as "unusual circumstances."

Recently, this division upheld the reasonableness of a detention which occurred under similar circumstances in a high burglary area, but the activity we held to justify detention there was driving a vehicle on a private and deadend road, after business hours, in an area where no commercial activity was taking place. (*People* v. *Moreno* (1977) 67 Cal.App.3d 962 [134 Cal.Rptr. 322].) The essential and in our mind determinative distinction here is that, when first observed, defendants' activities did not objectively appear in the slightest degree criminally surreptitious, for they were standing in the lighted parking lot of a major motel, in a commercial area on the El Camino Real where several all-night restaurants operate.

I accordingly find that substantial evidence supported the trial court's conclusion.

Affirmed.


**RACANELLI, P. J.,** Concurring.—In disapproving the *Irwin* dictum (*In re Tony C.* (1978) 21 Cal.3d 888, 894 [148 Cal.Rptr. 366, 582 P.2d 957]), our Supreme Court has not—as implied by the dissent—rejected or otherwise abrogated the rules governing detention as formulated in its earlier decisions. (See *In re Tony C., supra,* at pp. 892-893; see also *People* v. *Harris* (1975) 15 Cal.3d 384, 388-389 [124 Cal.Rptr. 536, 540 P.2d 632] [cert. den., 425 U.S. 934 (48 L.Ed.2d 175, 96 S.Ct. 1664)]; *People* v. *Flores* (1974) 12 Cal.3d 85, 91 [115 Cal.Rptr. 225, 524 P.2d 353]; *People* v. *Gale* (1973) 9 Cal.3d 788, 797-798 [108 Cal.Rptr. 852, 511 P.2d 1204]; *Irwin* v. *Superior Court* (1969) 1 Cal.3d 423, 426-427 [82 Cal.Rptr. 484, 462 P.2d 12]; *People* v. *Moore* (1968) 69 Cal.2d 674, 682-683 [72 Cal.Rptr. 800, 446 P.2d 800] [overruled on other grounds, *People* v. *Thomas,* 19

---

[2]"Reasonably" i.e., judged not necessarily by the officer's subjective conclusion but by objective standards of reasonableness. (Cf. *In re Tony C., supra,* 21 Cal.3d 888 at p. 893, fn. 2.)

Cal.3d 630, 641 (139 Cal.Rptr. 594, 566 P.2d 228)].) The underlying rationale that the circumstances known to the police officer include specific and articulable facts causing him to reasonably suspect some crime-related activity involving the detainee has been reaffirmed rather than rejected.[1] (See *In re Tony C., supra,* at p. 893.) In applying those traditional principles, as clarified by *Tony C.*'s requirement that the perceived activity need only be rationally consistent with criminality, it is our duty to review the circumstances of the detention for constitutional validity based upon the findings below where supported by substantial evidence, as here. *(People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621]; see also *People* v. *Superior Court (Keithley)* (1975) 13 Cal.3d 406, 410 [118 Cal.Rptr. 617, 530 P.2d 585].)

It bears repeating that our function in reviewing errors of law does not include rejection of a supported factual determination concerning the crucial question whether the officer's suspicion was objectively reasonable in undertaking the challenged detention. Where that determination negates the criminal nexus between subjective perceptions and activity, we may not disregard it simply because the evidence and permissible inferences might support findings contrary to those made by the trial judge, the exclusive trier of fact. (See *People* v. *Lawler, supra,* 9 Cal.3d 156, 160.) If we do not faithfully adhere to that duty, then we could unwittingly contribute to the potential for random interrogations admonished by the court. (See *In re Tony C., supra,* at p. 897.)

**ELKINGTON, J.**—I respectfully dissent.

The instant appeal was transferred to us by the Supreme Court *"for reconsideration in the light of In re Tony C. (1978) 21 Cal.3d 888."* (Italics added.) I think we have not, at least not properly, done so.

We are concerned *only* with the relation of the Fourth Amendment to a temporary police detention of a person, upon suspicion that he is engaged in criminal activity. My esteemed colleagues agree.

The state's high court had tersely stated the applicable rule in *People* v. *Gale,* 9 Cal.3d 788, 797-798 [108 Cal.Rptr. 852, 511 P.2d 1204], as follows: " 'While a detention of a citizen by a police officer based on a "mere

---

[1]Curiously, the unusual conclusion reached in the dissent is itself at odds with the earlier statements therein recognizing such firmly established principles. (See dis. opn. of Elkington, J. at pp. 736-737, 738 and 740.)

*hunch"* [italics added] is unlawful, if there is a rational *suspicion* that some activity out of the ordinary is taking place, and some *suggestion* that the activity is related to crime, a detention is permissible.' " (See also *People* v. *Harris,* 15 Cal.3d 384, 388-389 [124 Cal.Rptr. 536, 540 P.2d 632] [cert. den., 425 U.S. 934 (48 L.Ed.2d 175, 96 S.Ct. 1664)]; *People* v. *Flores,* 12 Cal.3d 85, 91 [115 Cal.Rptr. 225, 524 P.2d 353].)

The "rational suspicion" of *People* v. *Gale, supra,* 9 Cal.3d 788, need not have been a *strong suspicion,* for in that case the policeman would have probable cause for an arrest. (See *People* v. *DeVaughn,* 18 Cal.3d 889, 894 [135 Cal.Rptr. 786, 558 P.2d 872].) "[C]ircumstances short of probable cause to make an arrest may still justify an officer's stopping pedestrians or motorists on the streets for questioning." (*People* v. *Mickelson,* 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658]; and see *People* v. *Harris, supra,* 15 Cal.3d 384, 388.)

But in the application of the rule, the dividing line between "mere *hunch"* and *"suspicion"* or *"suggestion"* was often uncertain. What some courts recognized as a "hunch," others viewed as the required "suspicion" or "suggestion," and vice versa. And the uncertainty was compounded by dicta found in *Irwin* v. *Superior Court,* 1 Cal.3d 423, 427 [82 Cal.Rptr. 484, 462 P.2d 12]: "Where the events are as consistent with innocent activity as with criminal activity, a detention based on those events is unlawful."

*In re Tony C.,* 21 Cal.3d 888 [148 Cal.Rptr. 366, 582 P.2d 957], to which our consideration is commended, undertook to clarify the rule. In disapproving the above noted dicta of *Irwin* v. *Superior Court,* the court stated:

"[A] reasonable suspicion of involvement in criminal activity will justify a temporary stop or detention. Under that standard, *if the circumstances are 'consistent with criminal activity,' they permit—even demand—an investigation*: the public rightfully expects a police officer to inquire into such circumstances 'in the proper discharge of the officer's duties.' . . . No reason appears for a contrary result simply because the circumstances are also 'consistent with lawful activity,' as may often be the case. The possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct. Indeed, the principal function of his investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal—to 'enable the police to quickly determine whether they should

allow the suspect to go about his business or hold him to answer charges.' " (21 Cal.3d, p. 894.)

Thus, in the clearest language, the court has announced that if the circumstances apparent to the policeman are "consistent with criminal activity," the required "rational suspicion" is necessarily justified, and an ensuing temporary investigative detention is in constitutional accord.

But *Tony C.* also makes clear that the detention itself must be *reasonable* in its scope, duration, and manner. For: "The guiding principle, as in all issues arising under the Fourth Amendment and under the California Constitution . . . is 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' " (21 Cal.3d, p. 892; and see *People* v. *Ingle,* 53 Cal.2d 407, 413 [2 Cal.Rptr. 14, 348 P.2d 577] [cert. den., 364 U.S. 841 (5 L.Ed.2d 65, 81 S.Ct. 79)].)

And in any judicial determination whether the circumstances apparent to the policeman are "consistent with criminal activity," proper respect will be paid to police expertise. For, " '[e]xperienced police officers naturally develop an ability to perceive the unusual and suspicious which is of enormous value in the difficult tasks of protecting the security and safety of law-abiding citizens. The benefit thereof should not be lost because the cold record before a reviewing court does not contain all the particularized perceptions which may have been so meaningful at the scene.' " (*People* v. *Gale, supra,* 9 Cal.3d 788, 795-796.)

I look to the record of the case before us, in determining whether the circumstances here apparent to the policeman were "consistent with criminal activity," according to *Tony C.* If so, it is of no consequence that they were also "consistent with lawful activity" for, as noted, *Tony C.* says: "The possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct. Indeed, the principal function of his investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal—to 'enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges.' " (21 Cal.3d, p. 894.)

There is no dispute on the evidence as presented to the magistrate, and then to the superior court, on Davis' and Snowden's Penal Code section 1538.5 motion to suppress. The superior court therefore " 'resolved no

conflicts in the evidence since there were none,' " and the determination of *Tony C.*'s "suspicion of criminal conduct" and "reasonableness" as applied to the facts of this case is now for this court alone. (*People* v. *Manning,* 33 Cal.App.3d 586, 602-603 [109 Cal.Rptr. 531]; *People* v. *Leighter,* 15 Cal.App.3d 389, 396 [93 Cal.Rptr. 136] [disapproved on other grounds *Madril* v. *Superior Court,* 15 Cal.3d 73, 77-78 (123 Cal.Rptr. 465, 539 P.2d 33)].)

A lone policeman was driving his clearly marked patrol car around 4 o'clock one morning in a "motel-business" area where (as found by the magistrate) there had been "an extreme rash of motel and automobile burglaries . . . ." Alert, and as a police officer should, he was looking for "suspicious circumstances." Cruising his recognizable police vehicle past a motel facing the far side of the street, he observed an automobile in the rear area of the motel's parking lot. The vehicle was not properly parked within the lot's "white lines," and "obviously . . . somebody wasn't just getting in and out from the motel." And the vehicle was immediately adjacent to several properly parked cars. Doors of the automobile were open, there was a man on either side of it, and the officer couldn't tell what they were doing. No reason appeared for anybody at that time of the morning "to be in the lot . . . clearly blocking . . . about three or four other cars so they couldn't get out of the lot, so it wasn't a place where somebody had parked all night." The officer quickly made a U-turn, but in the few intervening seconds the suspect automobile had left the motel's parking lot and was being driven away.

The officer decided "just to check out for two possible actual burglary suspects in the motel, because we have had so many vehicle burglaries in that particular area, . . ." He called for a "back-up" over the police radio and asked that the motel parking lot be checked for criminal activity. The departing vehicle, occupied by Davis and Snowden, was soon stopped, and while the officer was examining the driver's identification the police radio announced discovery in the motel parking lot of a suitcase filled with seemingly stolen property. It was apparently left behind in Davis' and Snowden's flight upon seeing the passing police car. Soon the back-up officer arrived; he was at the moment told only by the other busy officer that the vehicle was stopped "for suspicious activity in one of the motel parking lots." The newly arrived officer "went up and shone [his] light [through the "rear and side windows"] in the back seat area of the car to check for other persons or weapons." He there observed in plain view a "crowbar," "leather gloves," "burglary tools," and particularly an "auto jack-pry tool." In respect of the latter he said, "I have seen them

used to pry open trunks, locked hoods . . . . I saw one fellow remove a whole rear window with one, and I have seen one . . . peel away an auto door with it."

As a result of the above described police activity much stolen property was recovered. It implicated Davis and Snowden in many burglaries, including three which had occurred elsewhere within an hour of their sighting by the cruising police officer.

As stated by my colleagues, the "sole issue presented on this appeal is whether . . . *the detention*—not the subsequent search—was unreasonable—and hence unconstitutional . . . ." The unreasonableness found by them relates to the detention itself, not its scope, or duration, or manner. Assuming, arguendo, the detention's validity no fault is found with the ensuing police conduct. And it might here be pointed out that an officer, standing where he has a right to be, may lawfully examine a motor vehicle's interior through its windows with a flashlight. (*People* v. *Rios,* 51 Cal.App.3d 1008, 1012 [124 Cal.Rptr. 737]; *People* v. *Wheeler,* 28 Cal.App.3d 1065, 1068 [105 Cal.Rptr. 56]; *People* v. *Bright,* 4 Cal.App.3d 926, 930 [84 Cal.Rptr. 691].)

In my respectful opinion, the record conclusively manifests (as was later demonstrated) that the circumstances apparent to the policeman were "consistent with criminal activity." The current "extreme rash of motel and automobile burglaries" were being perpetrated in the dead of night in motel parking areas by the use of nearby getaway cars in which the stolen property might be transported, by persons who might reasonably be expected to flee upon sighting nearby, a cruising police vehicle. The policeman's observations permitted—"even demand[ed] —an investigation [because] the public rightfully expects a police officer to inquire into such circumstances 'in the proper discharge of the officer's duties.' " (*In re Tony C., supra,* 21 Cal.3d 888, 894.) The only means of inquiry "into such circumstances" was the investigative vehicle stop and detention. Had the policeman chosen to first examine the motel parking lot for crime indications, the culprits would have disappeared.

It follows, I conclude, that the investigative vehicle stop and detention of this appeal comported fully with *Tony C.* and Fourth Amendment requirements.

It is noted that the superior court's "Opinion and Order," entered before *Tony C.,* was based on the premise that "the suspects' actions while in the parking lot were quite consistent with actions of people

having a legitimate right to be on the premises." My colleagues' opinion seems founded on a requirement that within the policeman's observation "[s]ome activity relating to crime must have occurred or be about to occur, . . ." Both rationales, as pointed out, are contrary to, and expressly rejected by, *Tony C.*

I would sustain the ruling of the magistrate, and reverse the order and judgment of the superior court.

A petition for a rehearing was denied February 20, 1979. Elkington, J., was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied April 12, 1979.